UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES STRANGE, *et al*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, *et al*, <br><br> Defendants. | Civil Action No. 14-435 (CKK) |

MEMORANDUM OPINION
(August 7, 2018)

Plaintiffs in this case allege that Defendants—the Islamic Republic of Iran, Mahmoud Ahmadinejad, Ayatollah Sayyid Ali Hoseyni Khamenei, the Army of the Guardians of the Islamic Revolution, Hamid Karzai, the Afghan Operational Coordination Group ("OCG"), the Afghan Special Operations Unit ("ASOU"), the Afghan National Security Forces ("ANSF"), the Islamic Republic of Afghanistan ("Afghanistan"), the Taliban, and Al Qaeda—"purposefully, knowingly, and negligently participated in the shoot-down or suicide bombing of a mission named Extortion 17, which resulted in the death of thirty (30) U.S. servicemen." Pls.' Mem. in Support of a Default Judgment, ECF No. 110, at 2. In summary form, Plaintiffs' lawsuit alleges that the Defendants listed above conspired together to shoot down (or, alternatively, to blow up from the inside) a helicopter carrying United States service members, including Navy SEALS who had recently participated in the mission to capture and kill Osama Bin Laden. Plaintiffs claim that "these brave men died because they were set up by their supposed allies, the Afghan government and its Security Forces, financed by Iran and its leaders, as has tragically occurred hundreds of times before August 6, 2011 and many times since." *Id.* at 1.

At the Court's direction, Plaintiffs have submitted a brief on the exceptions that they claim apply to the sovereign immunity of Defendants Afghanistan, OCG, ASOU and ANSF (collectively, "Afghanistan" or "the Afghanistan Defendants"). *See* Pls.' Supp. Briefing on the Exceptions to the Afghan Defs.' Foreign Sovereign Immunity, ECF No. 84 ("Pls.' Brief").

The Court has considered Plaintiffs' submission—as well as their prior and subsequent pleadings in this case—and has determined that Plaintiffs have not established that this Court has subject matter jurisdiction over Plaintiffs' claims against the Afghanistan Defendants. Those claims only will accordingly be DISMISSED WITH PREJUDICE.

## I. LEGAL STANDARD

This case implicates the Foreign Sovereign Immunities Act ("FSIA"). "The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). Pursuant to the FSIA, the Court has "original jurisdiction" over "nonjury civil action[s]" against foreign states "without regard to amount in controversy" if the claims seek "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993). Contrary to Plaintiffs' contention that the Court "should not make the arguments for terrorist Defendants," Pls.' Brief at 15, the Court has an obligation to assure itself that it has subject matter jurisdiction even though Defendants have not responded to Plaintiffs' Complaint. "[E]ven if the foreign state does not enter an appearance

2

to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]." *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n.20 (1983).

## II. DISCUSSION

Plaintiffs claim that two exceptions to the Afghanistan Defendants' immunity apply. First, they argue that the facts of this case fall under the FSIA's "commercial activity exception." Second, they argue that the Afghanistan Defendants have waived their immunity. Neither argument has merit.

**A. Commercial Activity Exception**

First, the commercial activity exception does not apply here. That exception, as relevant to Plaintiffs' argument, states that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Plaintiffs have not established that this case is based upon an act that is "in connection with" a "commercial" activity.

Plaintiffs argument for application of the commercial activity exception can be summarized as follows: Plaintiffs contend that "Defendants Afghanistan, the OCG, ANSF, and ASOU, engage in commercial activity with the United States" because of the "United States-Afghanistan Trade Investment Framework Agreement ('TIFA')." Pls.' Brief at 8. Plaintiffs explain that TIFA has "acted as the primary forum for bilateral trade and investment discussions between the two countries." *Id.* Since the signing of TIFA, Plaintiffs state, "there has been a significant increase in trade flows" between the United States and Afghanistan. *Id.* "[R]egular meetings of the TIFA Council ensure the constant development of economic agreements

benefitting both" the United States and Afghanistan. *Id.* at 9. Plaintiffs recount that at a "TIFA meeting," the two countries issued a Joint Statement stating that they both sought to increase investment in Afghanistan and both agreed on the importance of commercial investment laws and regulations. *Id.* at 10-11. Based on the existence of TIFA, Plaintiffs argue that "[i]t cannot be any clearer that the United States and Defendant Afghanistan are in a commercially contractual relationship." *Id.* at 11. And, Plaintiffs contend, "undoubtedly the commercial nature of the United States' and Afghanistan's relationship, and the violations of those commercial contracts, are directly felt here in the United States." *Id.* at 14. "When the United States agrees to spend $5.1 billion a year to pay for the army and police—and western donors continue to give billions more for reconstruction and other initiatives in a private matter—the premeditated, unprovoked attacks and murders on plaintiffs' sons, using bullets, helicopters, and machinery that the United States provides, is not only a nexus felt in the United States but also a direct attack on the United States, plaintiffs' sons, and its citizens." *Id.*

There are two major problems with this argument. First, two nations entering into a trade and investment framework agreement is not a "commercial activity." "[A] state engages in commercial activity 'where it exercises only those powers that can also be exercised by private citizens, as distinct from those "powers peculiar to sovereigns."'" *Janini v. Kuwait Univ.*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) (quoting *Nelson*, 507 U.S. at 360 (internal quotation removed)). "'Put differently, a foreign state engages in commercial activity . . . only where it acts in the manner of a private player within' the market.'" *Id.* In deciding whether a state has acted like a private player in the market as opposed to a sovereign, the Court "must examine 'not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives' but 'whether the particular actions that the foreign state performs (whatever

4

the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce.'" *de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) (quoting *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614 (1992) (emphasis in original)).

The TIFA is a trade and investment framework agreed to by two sovereign nations. By entering into that agreement, Afghanistan was not exercising powers that a "private player within the market" could or would exercise. Private players in the market do not enter into agreements to encourage positive relations and trade between two countries and foster positive environments in those countries for growth and investment. This is something that sovereign nations do. In fact, to enter into such an agreement inherently would require the exercise of state authority. *See Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003) ("activities requiring state authority are not commercial").

Plaintiffs cite a string of cases and congressional statements in their briefing for the proposition that states act like private players in the market when they enter into contracts for goods or services, even if the purpose of entering into those contracts is a public one (for example, buying provisions for the state's armed forces or leasing vehicles for the state's mission to the United Nations). *See, e.g.*, *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 18 (D.D.C. 2003) ("a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity"). But these cases are inapposite, because TIFA is not a contract for goods or services. TIFA might help foster the growth of investment and trade which might result in contracts for goods or services being made, but it is not itself such a contract. It is an agreement between two sovereign countries setting

5

forth a mutual understanding about trade and investment. This agreement is not analogous to the sales, leases or other contracts that courts have found to constitute "commercial activity."

Plaintiffs also argue that the commercial activity exception applies because the United States has helped develop and train the Afghan National Security Forces. Pls.' Brief at 9-12. They cite congressional reports and additional agreements between the United States and Afghanistan in which the United States has committed to providing such assistance. *Id.* This argument fares no better. Afghanistan does not engage in commercial activity like a "private player in the market" by accepting foreign aid from the United States in the form of assistance in developing its armed forces. The commitments from the United States discussed in Plaintiffs' brief are not, as Plaintiffs seem to suggest, "contracts" Afghanistan has entered into for the purchase of goods or services. They are pledges from one sovereign nation to help develop the armed forces of another. That is not the type of activity that private players engage in.

Second, even accepting Plaintiffs' argument that any of the agreements or statements discussed above could be interpreted as "commercial activity" on the part of Afghanistan, there is simply no plausible way that this Court could say that Plaintiffs' claims in this case are based upon an act "in connection with" those commercial activities. The phrase "in connection with" as used in the commercial activity exception "demands that the acts complained of must have some substantive connection or a causal link to the commercial activity." *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149 (D.D.C. 2018) (internal quotation omitted). "[A] mere tangential or attenuated connection between the act and the commercial activity will not suffice." *Id.*

Plaintiffs make only a fleeting effort to demonstrate that a connection exists between the acts complained of in this case, a terrorist attack, and the allegedly commercial activities cited. They argue that the supposed commercial activities discussed above are connected to this case

6

because "[t]he United States has funded the Afghanistan military, OCG, and ASOU . . . and Defendants, in turn, have used those funds to ambush and kill members of the U.S. military." Pls.' Brief at 12.

This alleged connection is simply too attenuated. Plaintiffs claim that this case is about an act of terrorism. Their lawsuit is based on a terrorist attack: the shooting down (or, alternatively, blowing up from the inside) of a helicopter carrying U.S. service members. It is not about trade and investment agreements between the United States and Afghanistan, nor does the United States' general provision of support to the Afghanistan armed forces have any substantial connection or causal link with the facts at issue. Accordingly, even assuming that the activities Plaintiffs have highlighted in their pleadings could be viewed as "commercial," the commercial activity exception would still not apply because this case is not based upon an act in connection with those activities.

**B. Waiver**

Alternatively, Plaintiffs argue that Afghanistan has waived its immunity under the FSIA. A foreign state is not immune in any case "in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). Plaintiffs claim that Afghanistan implicitly waived its immunity through a provision in the 2015 Security and Defense Cooperation Agreement ("SDCA") between Afghanistan and the United States. That provision reads:

> United States forces authorities shall pay just and reasonable compensation in settlement of meritorious third party claims arising out of acts or omissions of members of the force and of the civilian component done in the performance of their official duties and incident to the non-combat activities of United States forces. Such claims shall be expeditiously processed and settled by United States

> forces authorities **in accordance with the laws and regulations of the United States** and seriously considering the laws, customs, and traditions of Afghanistan.

*See* Pls.' Brief at 4 (emphasis in original).

This provision of the SDCA simply cannot be interpreted as an implied waiver of Afghanistan's sovereign immunity. The D.C. Circuit has noted that there is an "exacting showing required for waivers of foreign sovereign immunity." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014). An implied waiver in particular "depends upon the foreign government's having at some point indicated its amenability to suit." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994). Plaintiffs fall far short of making such an exacting showing because the cited provision of the SDCA has nothing to do with suits brought against Afghanistan. It only addresses claims that are brought against "United States forces." Because this provision of the SDCA does not even speak about claims against Afghanistan at all, the Court certainly cannot say that it demonstrates Afghanistan's amenability to being subjected to suit in this country. *See Odhiambo*, 764 F.3d at 35 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442 (1989)) (noting that the Supreme Court has explained that "it cannot 'see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts.'").

Plaintiffs cite several district court cases for the proposition that "by selecting arbitration or by making yourself available to the laws and regulations of another country, here the United States, [a] contracting party is viewed to have waived its immunity." Pls.' Brief at 6. This line of authority is irrelevant. Plaintiffs have not brought to the Court's attention any agreement by Afghanistan that envisions that suits against it would be adjudicated by arbitration or in United

8

States courts. Again, the provision of the SDCA relied on by Plaintiffs does not speak at all to how claims against Afghanistan would be adjudicated.

### III. CONCLUSION

In sum, Plaintiffs have not demonstrated that any exception to the Afghanistan Defendants' sovereign immunity applies. Accordingly, the Court lacks subject matter jurisdiction over claims brought against those Defendants: the Afghan Operational Coordination Group, the Afghan Special Operations Unit, the Afghan National Security Forces, and the Islamic Republic of Afghanistan. Those claims only will be DISMISSED WITH PREJUDICE. An appropriate Order accompanies this Memorandum Opinion.

>     /s/
> COLLEEN KOLLAR-KOTELLY
> United States District Judge